TERRY et al., Appellants,

v.

OTTAWA COUNTY BOARD OF MENTAL RETARDATION
AND DEVELOPMENTAL DELAY; W.W. Emerson Co.
et al., Appellees.

[Cite as *Terry v. Ottawa Cty. Bd. of Mental Retardation & Developmental Delay*, 165 Ohio App.3d 638, 2006-Ohio-866.]

Court of Appeals of Ohio,
Sixth District, Ottawa County.

No. OT–05–009.

Decided Feb. 24, 2006.

642

Margaret M. Murray, Dennis M. Murray Sr., and Duane Galloway, for appellants.

Thomas J. Antonini and Mark A. Ozimek, for appellees.

Skow, Judge.

{¶ 1} Appellants ask us to reverse the decision of the Ottawa County Court of Common Pleas, which granted appellees' motion to exclude the opinion of appellants' expert witness that mold growth in appellees' building caused appellants' injuries. Appellants also ask us to reverse the trial court's grant of summary judgment to appellees as to all of appellants' claims. After a thorough review, we must conclude that the trial court erred in barring the testimony of appellants' expert witness and that the grant of summary judgment to appellees was therefore improper.

{¶ 2} The Ottawa County Board of Mental Retardation and Developmental Delay ("Ottawa County MR/DD"),[1] leased several suites in a building called "the Buckeye Building" from appellee W.W. Emerson Company ("Emerson"). Appellees Northcoast Property Management Company and its agent, Lake Investments, Inc., are allegedly responsible for maintenance of the Buckeye Building. Appellants, 15 employees of Ottawa County MR/DD, worked in the Buckeye Building from May 1996 until August 2000.

{¶ 3} In their complaint and through their deposition testimony, appellants allege that appellees had allowed the Buckeye Building to deteriorate and to develop damp, musty conditions that caused mold to grow on walls, windows, and carpeting. Appellants also allege that the damp, musty conditions caused poor indoor air quality, which in turn caused appellants to suffer from respiratory and other medical problems. Daniel Pfahl, Human Resources Director for Ottawa

---

1. Ottawa County MR/DD's motion to dismiss on grounds of governmental immunity was granted. It is not a party to this appeal.

County MR/DD, complained to appellees on behalf of the employees numerous times about the conditions in the building, and he requested needed repairs. Many of the complaints involved building conditions, such as leaky windows and bathroom fixtures and a malfunctioning heating and air conditioning system. Those defects allowed water to seep into the building, causing wood rot and mold. The employees described visible mold around windows, baseboards, floor tiles, vents, and carpeting. They also described a "foul smell of mildew" in the air, which became increasingly pronounced until the premises were vacated. Appellants allege that appellees' agents had walked through the building many times and that appellees were aware of the conditions.

{¶ 4} In May 2000, the Ottawa County MR/DD safety committee conducted an annual inspection of the Buckeye Building and found extremely dirty air vents, water-stained ceiling tiles, and complaints of headaches among the employees. The safety committee's report was given to appellees. In response, appellees did some cleaning of the building, including cleaning the carpets. The employees noted that during the month following the cleaning, their physical problems eased, but their symptoms returned after the carpeting again became discolored and more water streaks appeared on the walls. One employee then contacted the Ottawa County Health Department about the building's condition. In August 2000, the health department inspected the Buckeye Building and found mold growth. Shortly afterwards, Ottawa County MR/DD vacated the building.

{¶ 5} In early September 2000, at the request of the health department, Foley Occupational Health Consulting ("Foley") conducted air-quality surveys of the building by collecting four indoor air samples on different days. Testing reflected the presence of at least five species of mold spores in the air. Notably, Foley did not collect any outdoor air samples for a comparative analysis. In a letter to Pfahl, Foley noted that one fungus, *stachybotrys chartarum*, might have been the causative agent for the symptoms described by the employees, because it is sometimes known to cause symptoms such as "dermatitis, flu-like symptoms, fatigue, and diarrhea and may also affect the immune system." The report noted, however, that the testing revealed only low levels of this particular fungus.

{¶ 6} On September 25, 2000, the employees filed the instant complaint, asserting that appellees' negligence in allowing mold to grow in the building caused their health problems. Their health problems included, among other things, vomiting, chronic respiratory problems, headaches, fatigue, and joint pain. The employees' spouses added claims for loss of consortium. Shortly after the filing of the complaint, another company, Hygienetics Environmental Services, Inc. ("Hygienetics"), retained by appellants, conducted air-quality testing in the portions of the Buckeye Building previously occupied by appellants. Hygienetics took air samples for one day, over a four-hour time span. Unlike in Foley's

testing, outdoor air samples were also taken, in order to compare them with the indoor air samples. "Unopened sample media field blanks" were also analyzed and compared. Hygienetics also found five types of mold present, as well as bacteria not normally present in indoor or outdoor environments. Its report compared its analysis of the indoor and outdoor air samples to Foley's results.

{¶ 7} Appellants also obtained an opinion from Jonathan A. Bernstein, M.D., an allergist and immunologist, that the air quality in the Buckeye Building caused their illnesses. Appellees moved to bar Dr. Bernstein's testimony pursuant to Evid.R. 702, arguing that his methods could not meet the standards for admissibility of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. The trial court granted the motion, and soon thereafter, it granted appellees' motion for summary judgment on the grounds that appellants could not demonstrate that the Buckeye Building's conditions were the proximate cause of their injuries.

{¶ 8} Appellants present three assignments of error:

{¶ 9} "The trial court abused its discretion excluding the testimony of plaintiffs' expert, Jonathan Bernstein.

{¶ 10} "The trial court erred in granting defendants' motion for summary judgment on the personal injury claims.

{¶ 11} "The trial court erred in dismissing plaintiffs' case without ruling on plaintiffs' claims for negligent and intentional infliction of emotional distress."

## I. Appellants' Expert's Testimony

{¶ 12} In their first assignment of error, appellants argue that the trial court misapplied *Daubert* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and Evid.R. 702 in excluding their expert witness, Dr. Bernstein. Evidence orders are reviewed to determine whether the trial court abused its discretion. The term " 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. Trial courts have substantial discretion in determining which evidence to admit or exclude at trial. *Peters v. Ohio Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290, certiorari denied (1992), 506 U.S. 871, 113 S.Ct. 205, 121 L.Ed.2d 146. A reviewing court cannot conclude that a trial court abused its discretion merely because, in the same circumstances, it would have ruled differently or because the trial court committed a mere error in judgment.

{¶ 13} "However, where the trial court has misstated the law or applied the incorrect law and thereby given rise to a purely legal question, appellate review is de novo. *Shaffer v. OhioHealth Corp.*, 10th Dist. No. 03AP–102, 2004-

Ohio-63, 2004 WL 35725, at ¶ 6, citing *Ohio State Bd. of Pharmacy v. Dick's Pharmacy* (2002), 150 Ohio App.3d 343, [2002-Ohio-6500], 780 N.E.2d 1075; *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership* (1992), 78 Ohio App.3d 340, 346, 604 N.E.2d 808." *First Union Natl. Bank of Delaware v. Maenle* (2005), 162 Ohio App.3d 479, 487, 833 N.E.2d 1279. This district adopted this standard in *State v. Nguyen* (2004), 157 Ohio App.3d 482, 487, 811 N.E.2d 1180, appeal denied by 103 Ohio St.3d 1480, 816 N.E.2d 255, in which we held that while discovery orders are normally reviewed for an abuse of discretion, the review will be de novo when the decision was "based on a misconstruction of the law or an erroneous standard." Id., citing *State v. Today's Bookstore, Inc.* (1993), 86 Ohio App.3d 810, 823, 621 N.E.2d 1283, citing *Castlebrook, Ltd.,* supra.

■ {¶ 14} "[W]here a trial court's order is based on an erroneous standard or a misconstruction of the law, it is not appropriate for a reviewing court to use an abuse of discretion standard. In determining a pure question of law, an appellate court may properly substitute its judgment for that of the trial court, since an important function of appellate courts is to resolve disputed propositions of law.

■ {¶ 15} "Confusion has been engendered by an unfortunate choice of words when courts have said on occasion that an abuse of discretion connotes 'more than an error of law.' It would be more accurate to say that an abuse of discretion is 'different from an error of law.' A trial court's purely legal determination will not be given the deference that is properly accorded to the trial court with regard to those determinations that are within its discretion." *Castlebrook, Ltd.,* 78 Ohio App.3d at 346, 604 N.E.2d 808.

{¶ 16} The trial court carefully listed its grounds for excluding Bernstein's testimony:

{¶ 17} "[T]his Court cannot grant the admissibility of Dr. Bernstein's expert testimony because it (1) is not based upon sufficient facts or data, (2) it is not a product of reliable principles and methods, and (3) he has not applied the principles and methods reliably to the facts of the case. Also, for the reasons stated herein, this Court concludes that Dr. Bernstein's testimony lacks, as to the proximate cause of Plaintiffs' personal injuries, a methodology satisfying *Daubert* because: (1) Dr. Bernstein failed to adhere to an established methodology for differential diagnosis by not ruling in the suspected causes and by not ruling out other possible causes, (2) he failed to support his conclusions regarding a correlation between exposure to mold, irritants, and allergic reactions and the mold and irritants in the building as the proximate cause of Plaintiffs' ailments, (3) he relied solely on temporal causation to arrive at his conclusions, and (4) he failed to present a review of the literature to support his conclusions on this case."

{¶ 18} We hold that the trial court applied an incorrect standard of law. Ohio Evid.R. 702 provides:

{¶ 19} "A witness may testify as an expert if all of the following apply:

{¶ 20} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶ 21} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

{¶ 22} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

{¶ 23} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

{¶ 24} "(2) The design of the procedure, test, or experiment reliably implements the theory;

{¶ 25} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

{¶ 26} Generally, expert testimony is admissible and will "assist the trier of fact" if it both (1) involves matters "beyond the ken" of the ordinary person and (2) meets a threshold standard of reliability. See, generally, 1994 Staff Notes to Evid.R. 702. Reliability is often the key to determining whether an expert's testimony is admissible. Ohio has adopted the *Daubert* test for determining the reliability of an expert's opinion. See *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 687 N.E.2d 735.

{¶ 27} The parties dispute neither whether Dr. Bernstein is qualified as an expert nor whether his testimony relates to matters beyond the common knowledge of lay people. Dr. Bernstein's testimony did not involve a test, procedure, or experiment, so the factors of Evid.R. 702(C)(1) through (3) are inapplicable. The only remaining issue, which the parties vigorously dispute, is whether his testimony meets the "reliability" requirement of the Ohio Rules of Evidence.

{¶ 28} Factors used to test reliability include (1) whether the testimony is based on a theory or method that has or can be tested, (2) whether the testimony is based on a theory or method that has been subject to peer review, (3) the error rate of the particular theory or method, and (4) whether the theory or method has gained general acceptance in the field. *Daubert*, 509 U.S. at 593–

594, 113 S.Ct. 2786, 125 L.Ed.2d 469. These factors were not meant to be a "definitive checklist or test." Id. The inquiry must be "flexible" and the focus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595, 113 S.Ct. 2786, 125 L.Ed.2d 469. We also emphasize that even though a court may admit expert evidence, finding that it meets the threshold for reliability, the jury remains free to reject such evidence for any reason, including reasons of unreliability, incredulity, or clarity. *State v. Williams* (1983), 4 Ohio St.3d 53, 59, 446 N.E.2d 444.

{¶ 29} Up to this point, the trial court also followed the same standard of law. The trial court veered off this analytical path, however, when it considered the applicability of the Ohio rule's *Federal* counterpart, Fed.R.Evid. 702. That rule states:

{¶ 30} "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is *based upon sufficient facts or data,* (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." (Emphasis added.)

{¶ 31} Clearly, the trial court, in its decision quoted above, evaluated the evidence upon which Dr. Bernstein relied for sufficiency, and did not focus upon the *methods* he used to arrive at his conclusion. Also, at the beginning of its analysis, the court stated, "[T]he physical exams, medical histories, and clinical tests reviewed by Dr. Bernstein would be insufficient to reach a scientifically valid conclusion." This clearly references the inappropriate *federal* legal standard, and improperly weighs the evidence for sufficiency. Also, in its summary of Dr. Bernstein's opinion, the court stated, "[T]he limited information provided by Dr. Bernstein indicates that had 'differential diagnosis' been done in this case, the physical exams, medical histories, and clinical tests reviewed by Dr. Bernstein would be insufficient to reach a scientifically valid conclusion."

{¶ 32} In one of the first federal cases discussing the December 1, 2000 amendment to Fed.R.Evid. 702, which changed the rule to add a "sufficiency" requirement, the court in *Rudd v. Gen. Motors Corp.* (M.D.Ala., 2001), 127 F.Supp.2d 1330, explained the difference between *Daubert*'s reliability requirement and the federal rule by stating, "Neither of these two latter questions that are now mandatory under the new rule—the inquiries into the sufficiency of the testimony's basis and the reliability of the methodology's application—were expressly part of the formal admissibility analysis under *Daubert.*" Id. at 1337. But, see, *Nelson v. Tennessee Gas Pipeline Co.* (C.A.6, 2001) 243 F.3d 244, 250 ("The Advisory Committee Notes [to Evid.R. 702] explain that no specific factors were articulated in the new rule because the factors mentioned in *Daubert* are neither exclusive, nor dispositive, and do not apply to every type of expert

testimony. We are satisfied that the amendment to Fed.R.Evid. 702 does not alter the standard for evaluating the admissibility of the experts' opinions in this case"). Regardless, we would nonetheless hold that the trial court improperly weighed the sufficiency of the evidence supporting Dr. Bernstein's opinion in this matter.

{¶ 33} Understandably, the distinction between what is sufficient and what is reliable is easily blurred. *Rudd* further explained the federal rule:

{¶ 34} "[T]his sufficiency-of-basis inquiry is formally quite distinct from the sufficiency-of-evidence inquiry involved in summary-judgment analysis, that is, Rule 702 mandates a determination of whether the expert had sufficient evidence (evidence which itself may or may not be admissible) to support his or her testimony, not a determination of whether that testimony standing alone provides sufficient evidence to allow a reasonable fact-finder to find for the plaintiff on an issue of substantive law." *Rudd,* 127 F.Supp.2d at 1337.

{¶ 35} When an expert's testimony is challenged for unreliability, courts may perceive that an expert could not have reached his conclusion given the evidence available to him. That is, a court may conclude that because other evidence *could have* been gathered or *could have* been relied upon, the conclusion is *weaker* than it otherwise could have been. However, evaluating the *strength* of a conclusion is the jury's proper function in weighing the evidence (and this is not merely an equivocation of qualitative terms) and in determining whether a party has met its burden of proof. Reliability, on the other hand, involves only questioning whether the methodology is scientifically valid. Granted, some overlap may exist when the type and amount of evidence relied upon by the expert is clearly insufficient in the sense that it renders the expert's opinion weak enough to be unreliable. As *Rudd* noted, these two inquiries may be identical in certain circumstances, but can easily diverge in others. Id. Here, our inquiry must diverge.

{¶ 36} Upon careful review of the materials submitted in support of and in opposition to the motion to exclude Dr. Bernstein's testimony, and upon careful review of the cases relied upon by the trial court, we conclude that the trial court exceeded its gatekeeping function by improperly weighing the scientific evidence when it examined whether the testimony was based upon sufficient facts and data, rather than only determining whether Dr. Bernstein's methodology was based upon scientifically valid principles. See *Miller,* 80 Ohio St.3d 607, 613–614, 687 N.E.2d 735.

## A. Errors Bearing on Admissibility

{¶ 37} We must first discard those portions of the trial court's analysis barring Dr. Bernstein's testimony due to the insufficiency of the evidence upon which he relied. We find the following errors:

{¶ 38} First, the trial court found significant the fact that Dr. Bernstein did not personally conduct physical examinations of the plaintiffs-employees. This has never been the rule in Ohio. Evid.R. 703 allows an expert to base an opinion or inference on the facts or data either perceived by the expert or admitted into evidence. Here, the employees' medical records were perceived by the expert and were submitted to the trial court during discovery. "Expert testimony based on the medical records certainly constituted opinions or inferences based on facts or data admitted into evidence. *Lambert v. Shearer* (1992), 84 Ohio App.3d 266, 277–278, 616 N.E.2d 965 ('There is absolutely no restriction in the law that only treating physicians can testify * * *. If defendant wanted to delve more deeply into the records themselves or challenge [the expert's] construction of the evidence, he could have done so by cross-examination'); *Virag v. Allstate Ins. Co.* (Dec. 14, 1989), Cuyahoga App. No. 56391, unreported, 1989 WL 151291 ('The fact that [the expert] did not personally examine [the plaintiff-appellee] would go to the weight given to that testimony by the jury, but it in no way affects the propriety of admitting the evidence')." *Goddard v. Children's Hosp. Med. Ctr.* (June 12, 1996), 1st Dist. Nos. C–95–0278 and C–950295, 1996 WL 312474, at *1. See, also, *Asad v. Continental Airlines, Inc.* (N.D.Ohio, 2004), 314 F.Supp.2d 726, 743–744.

{¶ 39} Dr. Bernstein stated that he had reviewed each employee's medical history, including the test results from each treating physician ordered in the course of the employee's treatment. In their motion, appellees acknowledged that Dr. Bernstein had reviewed the employees' medical records, although they characterize his review as "brief." Regardless, this type of evidence—without distinction as to the quantity of it—has always been acceptable. On the issue of sufficiency and/or quantity of evidence, *Goddard* stated, "[O]nce a qualified expert's opinion is based on enough facts and data in evidence to have probative value, it is admissible. Whether the opinion represents the most credible conclusion presented is a question for the jury." *Goddard*, 1st Dist. Nos. C–95–0278 and C–950295, 1996 WL 312474, at *2.

{¶ 40} Second, the trial court's observation that Dr. Bernstein "did not refer to any specific literature, suggesting that Defendants go into 'Entrez PubMed' where there is a whole preponderance of literature" is irrelevant to a reliability analysis. It also observed, by quoting Dr. Bernstein's deposition, that he did not "specifically do a literature review and pull articles to review in preparing his report, and that he wasn't planning on doing any additional research, but that he was constantly pulling literature on—in this area, regarding building-related illness. * * * [H]e does not specifically cite any articles upon which he relies during his deposition or his correspondence concerning Plaintiffs."

This reasoning supported the trial court's fourth reason for barring Dr. Bernstein's testimony.

{¶ 41} The Ohio Supreme Court's recent decision in *Beard v. Meridia Huron Hosp.* (2005), 106 Ohio St.3d 237, 834 N.E.2d 323, compels us to negate this portion of the analysis. It held, "Expert witnesses are permitted to testify that their opinions are based, in part, on their review of the professional literature." Id. at syllabus.[2] To require an expert to cite specific literature upon which he relied in reaching his opinion would be to offer that literature for the truth of the matter asserted, which would amount to requiring inadmissible hearsay. Id. at 240, 834 N.E.2d 323. An expert may state that his review of relevant professional literature aids and supports his conclusion; in rebuttal, learned treatises may be used to impeach the expert's credibility. Id. As in *Beard*, Dr. Bernstein did not offer statements from specific literature sources; he testified that the literature provided only a *partial* basis for his opinion and that his opinion was also based on his education, training, and experience. The trial court therefore erred in barring Dr. Bernstein's testimony on the basis that "he failed to present a review of the literature to support his conclusions on this case." Id. at 242, 834 N.E.2d 323.

{¶ 42} Third, the trial court noted that Dr. Bernstein is not a "toxicologist" and that Dr. Bernstein did not "assert that he has any knowledge of the levels required for these various molds to become toxic or of the levels required for the molds to affect the Plaintiffs." When an expert has published numerous articles and book chapters regarding the relevant subject matter (as has Dr. Bernstein), is an established professor at a major Ohio medical university, teaching in a relevant field (as is Dr. Bernstein), states that he continually reviews applicable medical literature to keep up to date in his field (as did Dr. Bernstein), and has extensive clinical experience (as has Dr. Bernstein), then that expert's testimony is reliable as far it concerns his scholarly credentials. Further, Dr. Bernstein never asserted as a conclusion that it was the toxic nature of the molds that caused appellants' symptoms or diseases; rather, his testimony focused upon the irritant effects of mold and mold by-products, including respira-

---

2. Although *Beard* was decided after the trial court entered its decisions on the motion and summary judgment, it was decided while this case was pending on appeal. It is well settled that decisions of the Ohio Supreme Court apply retroactively to cases pending on appeal, unless an exception applies. "In the absence of a specific provision in a decision declaring its application to be prospective only, * * * the decision shall be applied retrospectively as well: * * * The general rule is that a decision of the court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former was bad law, but that it never was the law." *State ex rel. Bosch v. Indus. Comm.* (1982), 1 Ohio St.3d 94, 98, 1 OBR 130, 438 N.E.2d 415, quoting *Peerless Elec. Co. v. Bowers* (1955), 164 Ohio St. 209, 210, 57 O.O. 411, 129 N.E.2d 467.

tory effects, a subject that is within the purview of his specialty as an allergist. Later, we will further discuss the trial court's conclusions with respect to toxicity.

{¶ 43} Fourth, the trial court agreed with appellees that the term "sick building syndrome" ("SBS") is not a valid or scientifically recognized diagnosis, and it pointed to Dr. Bernstein's statement in deposition agreeing that SBS is not a "valid syndrome." However, both the trial court and appellees lifted Dr. Bernstein's quotes from their context. In answer to the question, "Do you recognize sick building syndrome as a valid diagnosis?" Dr. Bernstein stated:

{¶ 44} "Do I recognize sick building syndrome? Well, you know, if you look at the literature, it will say there's no such thing as sick building syndrome. So maybe you can turn around and say, building related illness, and people will accept that terminology rather than sick building. Okay? Buildings aren't sick.

{¶ 45} "But there are—there is such a thing as building related illness. And I think that—I think it's semantics myself. * * * The—this whole issue, whether you call it sick building or building related illness, is still unresolved into the—from a scientific perspective."

{¶ 46} Dr. Bernstein's discussion of the terminology appropriate to appellants' alleged maladies is not self-contradictory and is relevant. Dr. Bernstein was merely noting a lack of disagreement in his field as to the terminology—and he was also noting that the two referential terms denoted the same referent. We next examine whether the trial court correctly concluded that (notwithstanding the *amount* of evidence he considered) Dr. Bernstein's testimony and opinion were unreliable.

## B. General and Specific Causation

{¶ 47} Discarding, as we must, the foregoing points on which the trial court improperly examined the sufficiency of the evidence, we now examine whether the trial court abused its discretion in holding Dr. Bernstein's methodology unreliable pursuant to Evid.R. 702 and *Daubert*. The trial court concluded that Dr. Bernstein's differential diagnosis was not a valid scientific method, and in fact was not science, because he failed to adhere to established methods of performing a differential diagnosis. Appellants argue that Dr. Bernstein did conduct a valid differential diagnosis and that no court has excluded an expert's differential diagnosis. The trial court found Dr. Bernstein's method of differential diagnosis unreliable for three main reasons: it relied heavily upon temporal causation, it failed to "rule in" and "rule out" mold and other irritants or allergens as the cause of appellants' injuries, and Dr. Bernstein could neither testify about any quantitative amounts of mold to which appellants were exposed nor specify a quantitative amount of mold exposure necessary to cause injury.

{¶ 48} We hold the trial court's decision regarding the reliability of Dr. Bernstein's differential diagnosis to be correct on the first two grounds, but we disagree with the third. Yet the trial court was ultimately incorrect regarding the extent to which Dr. Bernstein's opinion is admissible because of the court's failure to distinguish between general and specific causation. The trial court focused entirely upon whether Dr. Bernstein could establish specific or proximate causation, and ultimately barred his testimony on that basis, while neglecting to examine whether his testimony was relevant and reliable on the issue of general causation. In so doing, the court ignored the hornbook rule that an expert's opinion and testimony may be admissible for one issue or purpose, yet inadmissible for another. See, e.g., *Asad v. Continental Airlines Inc.*, 314 F.Supp.2d at 743. In effect, the trial court threw the general causation baby out with the proximate causation bathwater.

{¶ 49} In order to prove that X substance caused a plaintiff to suffer Y medical condition, a plaintiff must show both "(1) that the toxic substance is capable of causing the condition (general causation) and (2) that the toxic substance in fact caused the plaintiff's medical condition (specific causation)." *Valentine v. P.P.G. Industries, Inc.*, 158 Ohio App.3d 615, 2004-Ohio-4521, 821 N.E.2d 580, ¶ 17. In order to demonstrate specific causation, the "plaintiff must show that he was exposed to the toxic substance and that the level of exposure was sufficient to induce the complained-of medical condition (commonly called a 'dose-response relationship')." Id., fn. 1. Although we vote that "[e]xpert testimony ordinarily will be required to prove both general and specific causation," expert testimony is not always required. Id. at ¶ 17. See, also, Kanemoto, "Scientific Expert Admissibility in Mold Exposure Litigation: Establishing Reliability of Methodologies in Light of Hawai'i's Evidentiary Standard (2003)," 26 U.Haw.L.Rev. 99, for an extended discussion of causation in mold cases.

{¶ 50} As we noted in *Cutlip v. Norfolk S. Corp.*, 6th Dist. No. L–02–1051, 2003-Ohio-1862, 2003 WL 1861015, some fields have not yet yielded a quantifiable threshold level of harmful exposure for certain agents, or a dose-response relationship supportive of specific causation. Citing *Hardyman v. Norfolk & Western Ry. Co.* (C.A.6, 2001), 243 F.3d 255, 262, fn. 3, we described a dose-response relationship as "[a] certain level of exposure to an agent below which disease does not occur and above which disease does occur." *Cutlip*, 2003-Ohio-1862, 2003 WL 1861015, at ¶ 51. When a sound differential diagnosis has been performed, the need for evidence of threshold levels is obviated. Id. Also, we recognized that "only rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes. * * * [S]uch evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for

an expert's opinion on causation." Id. at ¶ 52, citing *Westberry v. Gislaved Gummi AB* (C.A.4, 1999), 178 F.3d 257, 264. This is especially so when a substance is commonly known to be a symptom-causing or disease-causing agent, as in *Westberry*, which considered talc as a known irritant. Threshold levels should not be required as proof when no study has been or could be conducted or when the level will always vary from individual to individual. Id. at ¶ 55, citing *Hardyman*, 243 F.3d at 265.

{¶ 51} Dr. Bernstein testified to various aspects of mold and fungi that render them irritants and that can cause the symptoms appellants experienced. While explaining the difference between the allergen-, toxicity-, and irritant-induced effects of mold, he also explained that studies or experiments establishing a dose-response relationship for each of the three categories cannot be conducted due to the nature of mold exposure:

{¶ 52} "We just—you can't challenge people. The problem is that when you start doing these studies, you can't do inhalational challenge studies on mold. They're toxins, they—they're potentially toxic, they're potentially pathogenic, they're infectious. If I'm going to give someone a bolus of mold spores in their lungs, I mean, I can get sued. It's very difficult.

{¶ 53} "We can do provocation studies for other types of inhalational exposures, but it's—we could do ozone exposures. We've done challenges—sulphur dioxide challenges, we've done nitrogen dioxide challenges. Because we know what the EPA's regular—you know, total—you know, permissible exposure levels are over one hour and, you know, time weighted averages of one hour and over eight hours. We don't know what those things are for molds.

{¶ 54} "Environmental problems are hard to solve. It's not like studying animals. We can't lock people up in cages, and we can't—and there's a lot of confounding variables that can influence things and so forth. So we have to control for those."

{¶ 55} Therefore, despite the (alleged) unavailability of a quantifiable dose-response relationship or quantifiable threshold levels of mold necessary to cause harmful effects, an expert may still opine as to specific causation; that is, he may give his opinion that some agent, able to cause harm, did in fact cause harm in a particular plaintiff. Here, similar to the situation in *Westberry*, 178 F.3d 257, Dr. Bernstein opined as to the irritant and allergic effects of mold, fungus, and poor indoor air quality, not as to the toxicity of mold. Therefore, on the facts of this matter, a quantifiable dose-threshold relationship is not required.

{¶ 56} However, a scientifically valid basis is still necessary to support an expert's conclusions regarding specific causation in order to be reliable and admissible. Appellants assert that Dr. Bernstein conducted a differential diagno-

sis, and that that diagnosis suffices to demonstrate specific causation. We agree with the trial court: Dr. Bernstein did not conduct a scientifically valid differential diagnosis, because his method relied primarily upon temporal relationships and because he did not rule out other possible causes. He was properly barred from testifying to specific causation.

{¶ 57} This court has had prior occasion to examine whether the method of differential diagnosis passes muster pursuant to *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. The method is a "standard diagnostic tool" in medicine. *Cutlip*, supra, 2003-Ohio-1862, citing *Glaser v. Thompson Med. Co., Inc.* (C.A.6, 1994), 32 F.3d 969, 978. "Differential diagnosis" is defined as " 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.' Stedman's Medical Dictionary 428 (25th Ed.1990). The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests. A doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable. *Kannankeril v. Terminix Internatl., Inc.* (C.A.3, 1997), 128 F.3d 802, 807. See, also, *Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d at 260–261 (defining 'differential diagnosis' in a similar fashion); *Baker v. Dalkon Shield Claimants Trust* (C.A.1, 1998), 156 F.3d 248, 252 (differential diagnosis involves 'identifying a medical "cause" by narrowing down the more likely causes until the most likely culprit is isolated')." *Cutlip*, supra, at ¶ 45. A soundly performed differential diagnosis satisfies the *Daubert* requirements for reliability. See id. at ¶ 46 and cases cited therein.

{¶ 58} In *Cutlip*, 2003-Ohio-1862, the plaintiff, a railroad engineer, alleged that he was "unnecessarily exposed to diesel fumes because of certain practices and conditions" at his place of employment. The plaintiff presented several experts who each testified that diesel fumes caused his injury: his treating pulmonologist, who diagnosed reactive airway disease or asthma; a physician who, after a physical examination, diagnosed permanent asthmatic bronchitis; and a board-certified industrial hygienist, licensed engineer, and forensic toxicologist, who testified to the employer's standard of care regarding toxic substances and hazards. The railroad appealed the jury verdict, arguing that the plaintiff's expert opinion was unreliable and improperly admitted. This court held the experts' differential diagnosis that exposure to diesel fumes caused the plaintiff's injury admissible because "(1) diesel fumes are toxic; (2) diesel fumes cause asthma; (3) appellee had substantial exposure to diesel fumes on the job; (4) appellee has asthma; and (5) his asthma is not related to his prior smoking habit or the chest wound from Vietnam." Id. at ¶ 56.

{¶ 59} Regarding the trial court's conclusion that Dr. Bernstein relied solely upon temporal causation, appellants admit the applicability of the rule that a diagnosis based solely upon a relationship in time is scientifically invalid. "It is well settled that a causation opinion based solely upon a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Evid.R.] 702." *Schmaltz v. Norfolk & Western Ry.Co.* (N.D.Ill., 1995), 878 F.Supp. 1119, 1122 (although the term "insufficient" should be replaced with "unreliable"). Known to logicians as "post hoc ergo propter hoc"—"after this, because of this"—it is common logic that a temporal relationship—standing alone—does not establish causation. As the trial court aptly observed, a judge need not be scientifically trained in order to apply common logic and legal principles to scientific testimony, and our clerk is also "blissfully innocent of any scientific training." *Cavallo v. Star Ent.* (E.D.Va.1995), 892 F.Supp. 756, 771, reversed in part on other grounds, *Cavallo v. Star Ent.* (C.A.4, 1996), 100 F.3d 1150. The trial court mined numerous cases barring expert testimony in which the expert relied solely or primarily upon a temporal relationship in order to establish a causal link between two events. See, e.g., *In re Breast Implant Litigation* (D.C.Colo.1998), 11 F.Supp.2d 1217, 1238–1239 ("The fact of a temporal relationship establishes nothing except a relationship in time. Proof of a temporal relationship merely suggests the possibility of a causal connection and does not assist Plaintiffs in proving medical causation"), citing *In re Swine Flu Immunization Prods. Liability Litigation* (D.C.Colo.1980), 533 F.Supp. 567, 581; *Cuevas v. E.I. DuPont de Nemours & Co.* (S.D.Miss.1997), 956 F.Supp. 1306, 1311 (ruling expert testimony barred pursuant to *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, because causation opinion of expert witness was based solely on temporal relationship), citing *Cartwright v. Home Depot U.S.A., Inc.* (M.D.Fla.1996), 936 F.Supp. 900.

{¶ 60} Upon our examination of these cases, and applying common logic and the legal rule to Dr. Bernstein's testimony, we find no abuse of discretion barring his testimony on specific causation.

{¶ 61} Although we have held that differential diagnosis does not always require plaintiffs to "rule in" causes because differential diagnosis is a process in which physicians "rule out" potential causes, ruling out causes is always necessary for a valid differential diagnosis. *Cutlip*, 2003-Ohio-1862 at ¶ 52–53, following *Westberry v. Gislaved Gummi AB*, supra, 178 F.3d 257. The trial court unnecessarily observed that Dr. Bernstein did not pinpoint which specific fungus acted as a toxin and whether that specific toxin specifically affected a specific plaintiff, because (1) if all other competing possible causes were ruled out for each plaintiff, and mold was the only or most likely remaining possible causative agent, then a direct link is diagnostically unnecessary and (2) Dr. Bernstein did not

advance any opinion as to any toxic effect of these plaintiffs' exposures. In fact, Dr. Bernstein stated that the current state of his field is such that "in terms of inhalational and dermal exposure to toxins, less is known. They're mostly descriptive cases and very difficult—have yet to really establish true cause and effect from toxins and the mold related health effects." His opinion is comparable with a case repeatedly cited by appellees, *Roche v. Lincoln Property Co.* (E.D.Va.2003), 278 F.Supp.2d 744, which barred an expert's testimony on the issue of specific causation because the expert had not and could not conduct a reliable differential diagnosis concluding that exposure to mycotoxins caused the plaintiffs' injuries. We agree with appellants that *Roche* is disanalogous to the present facts insofar as that court (which does not create binding precedent for this court) considered only the disputed expert's ability to pinpoint the *toxic* effects of exposure to mycotoxins. That court's decision, in our view, was impermissibly influenced by its in-depth examination of scholarly medical articles that concluded that any causal connection between mycotoxins and a "poorly defined set of symptoms" is weak and unproven by scientists in the field. Also, appellants correctly observe that this matter is more akin to *Westberry,* because, as in the case of talc, no quantifiable threshold is necessary to determine that molds and fungi may have irritant- and allergen-induced effects. However, the *Roche* decision correctly, in our view, held that an expert's testimony that relies primarily upon a temporal relationship in order to establish specific causation is scientifically unreliable and thus inadmissible pursuant to *Daubert* and Evid.R. 702.

{¶ 62} Here, Dr. Bernstein, certified in allergy immunology, testified only to the general causative properties of mold as an allergen and an irritant. He stated, "I don't think mycotoxins have anything to do with this. * * * I don't consider toxins irritants, okay, and I don't think I stated that this was due to exposure to mycotoxins, okay?" His testimony with respect to the distinctions between mold's alleged toxic effects and its *allergen and irritant* effects would be helpful to a jury and is relevant and probative to the issue of general causation— whether the specific types of mold identified in Foley's and Hygienetics's reports are capable of causing certain irritant- and allergen-induced effects.

{¶ 63} Dr. Bernstein opined that, in general, some individuals are susceptible to the allergen and irritant effects of mold, depending on the amount and duration of exposure and other individual sensitivities, and that, in general, mold spores and other mold byproducts create air particulates that act as irritants to respiratory systems and have other effects. His scholarly and clinical experience and his reviews of the literature formed the basis of his opinions regarding the general causative properties of mold. Appellees may certainly challenge his

testimony on general causation either upon cross-examination or through the opinion of their own expert.

{¶ 64} However, the trial court correctly barred Dr. Bernstein's testimony on the issue of specific causation. Dr. Bernstein repeatedly acknowledged the necessity of controlling for other causative variables, and indicated that he had not done so with these plaintiffs; thus, he failed to rule out other possible causes of appellants' ailments. In his deposition testimony, Dr. Bernstein never gave any specific basis establishing or tending to establish causation for any particular plaintiff beyond the relation in time between their exposure to mold and their symptoms. He testified that he based his conclusions "on their symptoms occurring while they were in the workplace and improving while they were outside of the workplace, and not having long-term related problems, that they aren't having these problems and so forth."

{¶ 65} In his reports to appellants' counsel, after briefly listing each plaintiff's symptoms and without further explanation, he wrote:

{¶ 66} "I conclude that these individuals were suffering from building-related illness due to poor ventilation, filtration and humidity control. This will or did result in accumulation of not only mold, but also mold byproducts, bacteria and other air particulates (these were not measured) resulting in many of these clinical manifestations. All of these workers, with the exception of Kathleen Taylor–Peters, have improved since being removed from the workplace, indicating that this is most likely an irritant-induced response related to the work environment. In summary, the workers who were evaluated from the Ottawa County MRDD experienced clinical symptoms consistent with building-related illness." With respect to the only other person Dr. Bernstein specifically mentioned, he wrote: "Ms. Terry has improved since being removed from the workplace, indicating that this is most likely an irritant-induced response to the work environment."

{¶ 67} Thus, although appellants contend that the trial court erroneously concluded that Dr. Bernstein relied solely upon temporal causation in reaching his opinion, we cannot say that the trial court abused its discretion. Appellants, citing *Heller v. Shaw Industries, Inc.* (C.A.3, 1999) 167 F.3d 146, argue that when a temporal relationship is "strong and is part of a standard differential diagnosis, it would fulfill many of the *Daubert* * * * factors." They also cite *Bonner v. ISP Technologies, Inc.* (C.A.8, 2001), 259 F.3d 924, for the proposition that "[u]nder some circumstances, a strong temporal connection is powerful evidence of causation." Be that as it may, in this matter, a temporal relationship alone does not provide a reliable basis for concluding that each individual person's exposures to mold caused his or her specific illnesses. Although Dr. Bernstein stated that he had reviewed the employees' medical records, he did testify that the main and

decisive factor in his conclusions regarding specific causation was the fact that the employees were sick while in the work environment and well when outside it. While this temporal relationship may be powerful evidence in mold cases in order to reach an ultimate conclusion as to specific causation, it cannot alone suffice for a valid differential diagnosis unless other potential causes are ruled out *for each particular plaintiff*. See *Cutlip,* supra, 2003-Ohio-1862, in which physicians ruled out smoking and a preexisting wound as causes.

{¶ 68} Although Dr. Bernstein explained extensively the general causative properties of mold and mold byproducts, he acknowledged that he had not evaluated the employees for exposure to irritants outside the workplace. He also admitted that he could not establish specific causation as to any particular plaintiff:

{¶ 69} "Q. [W]ould you be able to pick any names out of the list * * * and say, within a month after being removed, she was completely back to normal?

{¶ 70} "A. I would be able to—I have to go back and review the—each, you know, the record again. * * * I can only surmise what I've learned from the records and from the notes and from—and also from discussion, that these people have, for the most part, improved and have done better since being out of the workplace."

{¶ 71} Moreover, he had not, and admittedly could not, rule out other possible causes for each particular plaintiff. He stated that his conclusion "largely depends on their history, their types of symptoms, their improvement out of the workplace, worsening getting in the workplace, getting better—self limiting nature in most of these subjects. And then my clinical experience, seeing hundreds and hundreds of these types of patients, and knowing how the classical course of how these people do in and out of the workplace or home * * *." One plaintiff suffering from multiple sclerosis alleged that the Buckeye Building's conditions exacerbated that preexisting condition. When asked whether mold caused that plaintiff's symptoms to worsen, Dr. Bernstein stated, "You know, I really—I really can't—and I don't think I stated that, that I could associate a cause and effect from her MS and this environmental problem, okay? I mean, I think that would be very difficult to do."

■ {¶ 72} Appellants argue in their reply brief that Dr. Bernstein did conduct a valid differential diagnosis supportive of specific causation because no direct link is required, citing *Hardyman,* 243 F.3d 255, 262. We agree that no direct link is required, and the trial court clearly erred in requiring a "direct nexus between the levels of exposure to mold and any subsequent illnesses that affected the Plaintiffs." However, as the trial court duly noted, the validity of a differential diagnosis is derived from the thoroughness of the elimination process,

rather than from a rate of error. Here, Dr. Bernstein performed no discernible process of elimination regarding other potential causes of appellants' illnesses.

{¶ 73} Appellants also argue that even though appellees may point to alternative plausible causes, the defending party should be permitted to offer a reasonable explanation in rebuttal as to the reliability of the physician's opinion, citing *Cutlip,* 2003-Ohio-1862 at ¶ 47. Therefore, appellants assert, an evidentiary hearing should have been conducted in order to afford Dr. Bernstein an opportunity to explain his differential diagnosis pertaining to each plaintiff. They cite *Heller,* 167 F.3d at 157, in arguing that a court errs "in excluding expert medical testimony because a defendant's suggested alternative causes *(once adequately addressed by plaintiff's expert)* affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony * * * we held that even absent hard evidence of the level of exposure in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness."

{¶ 74} Although we ultimately conclude that the Hygienetics report and the employees' testimony is strong evidence that they were exposed, raising a genuine issue of fact, the trial court did not abuse its discretion in not holding a hearing when Dr. Bernstein was clearly incapable of opining on specific causation. He was asked whether he ruled out other causes:

{¶ 75} "Q. How do we get our hands around the issue well, geez, maybe, this particular plaintiff is a smoker or has a dog at home, or maybe on a particular day someone brought something in from the outside? Is there any way in this particular case to rule out those other causes or factor those out in any reasonable way?

{¶ 76} "A. Not—not totally, because there's—again, without knowing more details about the—how the building was maintained in terms of—I don't have a lot of information about those potential confounding factors. * * * And windows were probably closed and I imagine they had central air and so forth. * * * But I don't believe in this workplace they had animals running around. People weren't allowed to smoke indoors. So you have to make the same—all that being said, you know, they—they find that they're doing well at home but they're not doing well at work. And, you know, you—you have other confounding variables that have to be worked out, which I'm not privy to in terms of their dissatisfaction with work."

{¶ 77} Yet Dr. Bernstein did have each employee's medical history and record available to him and did not address any of the *known* variables, such as smoking, pet ownership, depression, or anxiety. Although appellants argue that appellees only speculated as to these additional variables, the variables are manifestly admitted to in the employees' depositions.

{¶ 78} After a detailed examination of his deposition testimony, we must conclude that it is reliable on the issue of general causation—that in Dr. Bernstein's opinion, and due to his knowledge and scholarly and clinical experience, mold is capable of causing certain symptoms and maladies. Therefore, to that extent, the trial court erred in barring his opinion. Although "knowledge connotes more than subjective belief or unsupported speculation," a court exceeds its gatekeeping function when it holds an expert to a "certainty" standard, or requires a "direct nexus" between a cause and its alleged effects, instead of reliable evidence supportive of causation. *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786, 125 L.Ed.2d 469. "But, in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." Id. Here, Dr. Bernstein's invalid differential diagnosis renders his testimony scientifically unreliable on the issue of whether these individual plaintiffs' illnesses were caused by mold exposure, and the trial court did not abuse its discretion in barring his testimony on the issue of specific causation. "But nothing in * * * *Daubert* * * * requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner* (1997) 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508.

{¶ 79} Although the court's decision was well researched and articulate, we must conclude that the decision to bar Dr. Bernstein's testimony on the issue of general causation improperly entered the jury's province and weighed the evidence. The reliability requirement should not be used to exclude evidence of "questionable reliability." *Miller*, 80 Ohio St.3d at 614, 687 N.E.2d 735. Each of these issues may be effectively explored upon cross-examination. Appellants' first assignment of error is therefore well taken.

## II. Summary Judgment

{¶ 80} The trial court granted summary judgment to appellees by relying upon Dr. Bernstein's omitted testimony in order to conclude that appellants could not advance a material fact relevant to causation. It stated that because Dr. Bernstein's testimony was barred, "Plaintiffs failed to establish proximate causation between any negligence on Defendants' part and their personal injuries. * * * Plaintiffs cannot show that they suffered injuries proximately caused by Defendants."

{¶ 81} An appellate court reviews a grant of summary judgment de novo, the same standard used by the trial court. *Smiddy v. Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 30 OBR 78, 506 N.E.2d 212. Pursuant to Civ.R. 56, a trial court is required to construe the evidence in a light most favorable to the nonmoving party, to determine whether any genuine issues of material fact exist, and to determine whether reasonable minds could differ as to whether judgment should be entered against the nonmoving party. Civ.R. 56(C). An appellate court, reviewing a grant of summary judgment, also examines the record in the light most favorable to the party opposing the motion. *Engel v. Corrigan* (1983), 12 Ohio App.3d 34, 12 OBR 121, 465 N.E.2d 932, paragraph one of the syllabus.

{¶ 82} In order to overcome summary judgment, a nonmoving party must advance specific, provable facts and not mere allegations; evidence of a possible inference is not sufficient. *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 52, 567 N.E.2d 1027. Throughout a summary-judgment review, the strength of inferences from the evidence should be tested to "determine whether they are sufficient to justify but one conclusion, which conclusion is adverse to the moving party." *Durham v. Major Magic's All Star Pizza Revue, Inc.*, 6th Dist. No. L–04–1192, 2005-Ohio-1029, 2005 WL 567078, ¶ 13.

{¶ 83} First, Dr. Bernstein's testimony is relevant and reliable on the issue of general causation: the proposition that mold causes certain symptoms. Thus, appellants have advanced a genuine issue of fact regarding general causation. Second, appellants have advanced genuine issues of material fact on the issue of specific causation, even discarding Dr. Bernstein's conclusions (or lack thereof) regarding particular employees.

{¶ 84} Construing all inferences from the air-sampling reports and the employees' depositions in their favor, we hold that this evidence is sufficient to raise genuine issues of material fact regarding specific causation. Air sampling is typically used to prove specific causation in mold cases. Kanemoto, 26 U.Haw. L.Rev. at 129–130. Establishing specific causation requires, in part, that particular plaintiffs prove that they were exposed to the substance capable of causing harm. The air-sampling reports and the employees' testimony regarding their exposures to mold in the Buckeye Building create issues of fact because the inference from this evidence is that they were exposed to mold.

{¶ 85} All of the employees testified in their depositions about their symptoms and illnesses. All of the employees correlated (albeit unscientifically) the onset of their symptoms to their exposure to the conditions in the Buckeye Building. As to the specific conditions in the building, the Hygienetics report contains a chart that shows the levels of each of five types of mold and compares those levels to both the *indoor air samples* and the *outdoor air samples.*

{¶ 86} The report relevantly concluded, (1) "All indoor bacterial air samples ranged from 1.5 to 13 times higher than the outdoor comparative reference sample"; (2) "*Actinomycetes* and *Bacillus* were detected in [Foley's] and the Hygienetics' bacterial air samples. * * * No *Actinomycetes* were detected in Hygienetics' outdoor reference air sample, and indoor *Bacillus* ranged from 1 to 3 times higher than the outdoor level"; (3) "*Stachybotrys chartarum* and *Aspergillus versicolor* were detected in [Foley's] and the Hygienetics' fungal air samples; * * * no *Stachybotrys chartarum* and *Aspergillus versicolor* were detected in Hygienetics' outdoor reference air sample"; (4) "Elevated levels of yeasts were detected [indoors] * * * and were not detected in the outdoor sample. Additionally, *Bacillus* and gram-negative bacteria were detected on this wipe sample and in the air sample collected in this room. Gram-negative bacteria were not detected in the outdoor sample"; (5) it is likely that "indoor airborne bacterial and fungal organisms were re-circulated and re-distributed back into the office environment by the HVAC system"; and (6) it is likely that "*Stachybotrys chartarum, aspergillus versicolor* and other toxin-producing fungi existed indoors at higher levels than detected during the Hygienetics survey while the building was occupied." We also find the report reliable because it contrasted its indoor air sampling with outdoor samples and with Foley's sampling results.

{¶ 87} While no conclusion can yet be made as to whether this evidence demonstrates that the levels are significant enough to cause illness, not to mention illness in these particular individuals, the reported difference between indoor and outdoor air quality is significant enough to raise a genuine issue of fact as to whether it *could* cause injury and whether it *did in fact* cause *these particular plaintiffs'* injuries. As in our previous discussion, we emphasize that an expert's reliable differential diagnosis supportive of specific causation must (1) not rely solely upon temporal causation and (2) must rule out and eliminate alternative potential causes until the most likely cause is isolated. It need not, however, "rule in" specific types of mold or, if scientifically unachievable, quantify a dose-threshold relationship, i.e., the specific levels of the mold necessary to cause injury. *Cutlip,* supra, 2003-Ohio-1862.

{¶ 88} The inferences from this evidence, construed in appellants' favor, are sufficient to create issues of material fact and preclude summary judgment; also, appellants may yet obtain a relevant and reliable expert opinion on the issue of specific causation. Appellees, through expert testimony or otherwise, may counter this evidence by noting that the Foley air samples were taken some time after the employees began manifesting illnesses and that the Hygienetics air samples were taken some time after the building was vacated and by noting that the Foley air samples were not compared against outdoor air samples for baseline analyses.

{¶ 89} Reversing summary judgment on the basis of this improper evidentiary ruling is proper because it affects the substantial rights of the adverse party. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 164–165, 17 O.O.3d 98, 407 N.E.2d 490. In its grant of summary judgment, the trial court explicitly relied on the fact that the plaintiffs had no expert witness to establish causation in order to conclude that they could not advance a genuine issue of fact. The prejudice to appellants is clear. The second assignment of error is therefore well taken.

### III.   Infliction of Emotional Distress Claims

{¶ 90} Because we reverse the grant of summary judgment on appellants' personal-injury claims, the grant of summary judgment on the claims for emotional distress is also reversed. Appellants are correct in that appellees did not move for judgment on the claims for emotional distress. "A claim for intentional infliction of emotional distress is an independent action." *Meyers v. Hot Bagels Factory, Inc.* (1999), 131 Ohio App.3d 82, 92, 721 N.E.2d 1068, citing *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666. A claim for emotional distress will lie where one who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another. Id. at syllabus. It is not necessary for a plaintiff to prove bodily injury in order to maintain his or her claim. Id. Appellants' third assignment of error is also well taken.

### IV.   Conclusion

{¶ 91} For the foregoing reasons, the judgment of the Ottawa County Court of Common Pleas is affirmed with respect to prohibiting Dr. Bernstein from testifying to specific causation and reversed with respect to his testifying on the issue of general causation. The grant of summary judgment is also reversed. We remand the cause for further proceedings consistent with this decision and judgment entry. Appellees are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

SINGER, P.J., and PARISH, J., concur.