**FINLEY, n.k.a. Gilliam et al., Appellants,**

**v.**

**FIRST REALTY PROPERTY MANAGEMENT, LTD. et al., Appellees.**

[Cite as *Finley v. First Realty Property Mgt., Ltd.*, 185 Ohio App. 366, 2009-Ohio-6797.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 24502.

Decided Dec. 23, 2009.

Terry A. Moore and Jacqueline Bollas Caldwell; John Maxwell; and Edward J. Heben Jr., for appellant Anne Gilliam.

Jacqueline Bollas Caldwell, for appellants the tenants.

Robert B. Daane, Robert J. McBride, and Jude Streb, for appellee First Realty Property Management Ltd.

Scott H. Kahn and George V. Pilat, for appellee First Realty Property Management.

Timothy J. Fitzgerald, John T. Murphy, and Richard C.O. Rezie, for appellee Realty One, Inc.

Frank Mazgaj, for appellee Grange Mutual Casualty Company.

Robert Daane; Mark Barbour; and Jude Streb, for appellee Sam's Investment, Inc.

Gary L. Nicholson, for appellee Merrimack Mutual Fire Insurance Company.

David Lester, for appellee Seneca Insurance Company.

---

WHITMORE, Judge.

{¶ 1} Plaintiffs-appellants, Anne M. Finley et al., appeal from the judgment of the Summit County Court of Common Pleas, entering summary judgment in favor of defendants-appellees, First Realty Property Management, Ltd. ("First Realty"), Sam's Investment, Inc. ("Sam's"), and Realty One, Inc. ("Realty One") (collectively, "the owners"). This court affirms.

I

{¶ 2} On March 6, 2003, Finley and 44 other current or former tenants of the Williamsburg Court Apartments (collectively, "the tenants") filed a 12–count complaint against the owners. The complaint asserted claims sounding in contract and tort, alleging personal injuries and damages based on the accumulation of moisture and hazardous mold in their apartments. Williamsburg Court Apartments were originally built in the 1960s, at which point Realty One Property Management Company, a division of Realty One, was the leasing agent and management company for the property. First Realty took over as the leasing agent and management company beginning on October 1, 1997. Sam's owned the property during the entire time period relevant to this appeal. Thus, the tenants named all owners in their suit, alleging that they had collectively failed to maintain the property in a habitable condition, which allowed for the growth of toxic mold in the apartments' heating and air-conditioning system, plumbing and sewer systems, and other areas in the tenants' apartments.

{¶ 3} In September 2005, the trial court determined that the tenants' claims would proceed separately, and the tenants were grouped into approximately 15 family units, with the Sparber family being the first to go to trial. The trial court also allowed all parties to file motions for summary judgment.

{¶ 4} In October 2005, the owners filed motions for partial summary judgment, which the tenants opposed. On February 2, 2006, the trial court granted the owners' motions with respect to three of the 12 counts: the intentional and negligent infliction of emotional distress and the loss of companionship. The motion was denied with respect to the remaining claims.

{¶ 5} On March 2, 2006, Realty One and Sam's filed a motion in limine to exclude testimony from the tenants' expert, Dr. Michael Linz. The tenants opposed the motion, and after briefing on the matter, the trial court held a hearing at which Dr. Linz testified. The trial court subsequently granted the motion to exclude Dr. Linz's testimony.

{¶ 6} On March 4, 2008, the owners filed motions for summary judgment on the claims of the Sparber family. The tenants opposed this motion, which the trial court granted on May 2, 2008. Thereafter, the owners filed motions for summary judgment as to all remaining tenants on all remaining claims. On October 27, 2008, the trial court awarded the owners summary judgment on their motions and dismissed all remaining claims of all the remaining tenants.

{¶ 7} The tenants have timely appealed, asserting three assignments of error for our review, which have been rearranged for ease of analysis.

## II

### Assignment of Error Number Two

The trial court erred in its May 4, 2006 order, when it excluded Dr. Linz' testimony as to the issue of specific causation.

{¶ 8} In their second assignment of error, the tenants argue that the trial court erred in excluding Dr. Linz's testimony to the effect that the Sparbers' illnesses were caused by their exposure to mold while residing in their Williamsburg Court Apartment. Specifically, they argue that Dr. Linz's testimony was admissible under Evid.R. 702 because (1) he had superior knowledge of the subject, which would aid the jury in understanding that mold had caused the tenants' illnesses, (2) he was qualified based on his skills, experience, training, education, and literature review to testify as to health conditions caused by mold exposure, (3) scientific journals and peer-reviewed literature support the existence of "building-related illness" caused by mold, and (4) he employed a reliable methodology for determining that the Sparbers and more generally, the tenants, were suffering from mold-induced "building-related illnesses." We disagree.

{¶ 9} "The determination of the admissibility of expert testimony is within the discretion of the trial court * * * [and] will not be disturbed absent abuse of discretion." *Valentine v. Conrad* ("*Valentine II*"), 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶ 9. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. An abuse of discretion demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748. When applying the abuse-of-discretion standard, this court may not substitute its judgment for that of the trial court. Id.

{¶ 10} The admissibility of expert testimony is governed by Evid.R. 702, which provides as follows:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons[;]

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *.

Evid.R. 702. To determine whether a proposed expert's testimony about a scientific technique or a scientific methodology is scientifically reliable, the trial court should focus on the following factors: "(1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance [in the scientific community]. * * * The focus is 'solely on principles and methodology, not on the conclusions that they generate.'" (Citations omitted). *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611–612, 687 N.E.2d 735, quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶ 11} In its decision to exclude Dr. Linz's testimony, the trial court remarked that "[g]enerally, [Dr. Linz] is well qualified to testify as a medical expert." The court further opined on the issue of Dr. Linz's methodology as follows:

Dr. Linz * * * reviewed a number of articles and other writing on the mold exposure issues, and after interviewing members of the Sparber family, concluded that there was a causal connection [based on] the fact that the Sparber family was exposed to the mold condition. There was inadequate methodology for his conclusions on the proximate cause as required by the *Daubert* test.

To the extent that the tenants argue that Dr. Linz's testimony should have been admissible under Evid.R. 702(A) and (B), such arguments are misplaced, as it is evident that the trial court excluded Dr. Linz's testimony on the basis of Evid.R. 702(C) alone.

{¶ 12} The determination that an expert is qualified in an area is distinctly different from a determination that the expert's testimony is scientifically reliable under Evid.R. 702(C). *Valentine II,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶ 17. "A trial court's role in determining whether an expert's testimony is admissible under Evid.R. 702(C) focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." *Miller,* 80 Ohio St.3d 607, 687 N.E.2d 735, at paragraph one of the syllabus. Accordingly, the trial court's focus is not on the substance of the expert's conclusion, but rather the methodology employed by the expert to reach such a conclusion. *Valentine II* at ¶ 16.

{¶ 13} Here, the trial court held a *Daubert* hearing to determine whether Dr. Linz's testimony was admissible to prove that the Sparbers had injuries that were caused by their exposure to mold while living in the Williamsburg Court Apartments. At the hearing, Dr. Linz testified that his medical opinion was that the Sparbers "had a constellation of symptoms which were consistent with an association of symptoms consistent with 'building-related illness.'" Though not adduced at the hearing, in an exhibit attached to the tenants' memorandum in

opposition to exclude Dr. Linz's testimony, Dr. Linz reported, without citations or reference, as follows:

> By definition, Building Related Illness, or BRI is a heterogeneous group of signs and symptoms related to a living or work environment in which microbial growth, in this instance, mold exposure, is the proposed agent associated with the signs, symptoms, and complaints of those exposed individuals. These signs and symptoms include but are not limited to:
>
> 1. Sneezing or irritant dry cough, chest tightness, burning sensation of the chest, shortness of breath, wheezing.
>
> 2. Burning sensation and watery eyes, sore throat and hoarseness.
>
> 3. Headaches of various types, runny nose and nasal congestion.
>
> 4. Unusual nosebleeds.
>
> 5. Skin and mucous membrane irritation.
>
> 6. Neurological complaints of dizziness, concentration and memory difficulties.
>
> 7. Fatigue and exhaustion which may be both physical and/or mental.
>
> 8. Gastrointestinal complaints including vomiting and nausea.
>
> 9. Feelings of feverishness.
>
> 10. Musculoskeletal complaints of joint and muscle pain.

Dr. Linz confirmed at the *Daubert* hearing that "building-related illness" was his sole medical diagnosis as to the Sparbers, as well as the remaining tenants.

{¶ 14} Dr. Linz testified that he "agree[d] there is not a specific standard that has been agreed upon in the medical literature that there is a threshold [level at which mold exposure adversely affects health]." He likewise confirmed that there are not governmental standards that establish a concentration or level at which mold exposure becomes hazardous, nor is there an accepted medical diagnosis code for "building-related illness."

{¶ 15} When questioned about the methodology he employed in this case, Dr. Linz testified as follows:

> I used my extensive years of training [in internal medicine] and medical background; I undertook a [routine] literature search * * * as well as a more focused literature search looking at data, both peer reviewed journals as well as other articles on building-related illness, an association of mold and damp indoor spaces, the association of mold and disease process.
>
> I underwent and reviewed each of [the individual tenant's] depositions in detail as well as their summary cover sheets. I reviewed their medical records that were provided to me. I either interviewed and physically saw and examined the vast majority of [the tenants], and if they were unavailable * * * a phone interview was conducted along the same line of questioning.

Specific to the Sparbers, Dr. Linz stated that he had read their deposition transcripts and the expert reports regarding the mold testing done in their apartment, as well as multiple scientific and medical journal articles on building and mold-related illnesses.

{¶ 16} Dr. Linz testified that he had never met Mr. and Mrs. Sparber or their two children face-to-face and did not conduct a medical examination of anyone in the family, but that he did interview the parents over the phone for approximately 40 minutes. Based on that interview, he determined that the Sparbers' son did not suffer any illness as a result of the mold exposure, but that the other family members did. When asked whether his diagnosis was based solely on "the subjective complaints of [the Sparbers,]" he replied, "yes." Dr. Linz testified that he had not reviewed the medical records of Mr. or Mrs. Sparber, nor had he contacted their treating physician or attempted to obtain their medical records from their physician.

{¶ 17} Dr. Linz testified that when he diagnosed patients in his private practice with mold-related ailments, he did so by performing various procedures on the patients, including chest x-rays, laboratory work, pulmonary-function tests, bronchoscopies, and allergy testing. He confirmed that he had not done any such testing on the Sparbers or any other tenants, though he did meet some tenants in person for a medical examination at an area hotel.

{¶ 18} It is evident from the record that no evidence was introduced at the hearing as to what, if any, generally accepted methodology has been adopted by the scientific community to establish a causal connection between the existence of mold and a person's health condition. Our review of the hearing transcript reveals that Dr. Linz failed to identify the generally accepted methodology he relied upon in determining that three members of the Sparber family contracted "building-related illnesses" while living in their Williamsburg Court apartment or that the methodology he employed has been tested or peer-reviewed by experts in the field of mold science. See, e.g., *Herzner v. Fischer Attached Homes, Ltd.,* 12th Dist. No. CA2007–08–090, 2008-Ohio-2261, 2008 WL 2004473, at ¶ 12 (excluding expert testimony based, in part, on a lack of evidence that the expert's methodology had been tested or peer-reviewed by other mold experts in the scientific community).

{¶ 19} In the tenants' opposition memorandum, they assert that Dr. Linz's "methodology is consistent with the methodology recommended by the University of Connecticut Health Center * * * in its September 30, 2004 publication * * * [titled] Recognition and Management of Mold- and Moisture-Related Illness." The publication, however, is not appended to the memorandum, nor was it introduced during the *Daubert* hearing to evidence that such a methodology has been generally accepted by the scientific community and determined to be a

reliable approach to diagnosing "building-related illness." Furthermore, Dr. Linz admitted that his methodology for diagnosing patients in his private practice with "building-related illness" differed significantly from the approach he took in diagnosing the Sparbers. Here, he did not review the medical records for, conduct an in-person examination of, or order any diagnostic testing on any of the Sparbers before diagnosing them with "building-related illness." Dr. Linz's testimony alone reflects that he had assigned the same diagnosis to the Sparbers, the remaining tenants, and the patients in his private practice, without employing the same methodology for reaching such diagnostic decisions. That is, he was able to reach the same diagnosis of "building-related illness" in those different instances, whether he had physically examined or merely conducted a phone interview with the patient, whether he had any medical records for the patient, or whether he had done any diagnostic testing on the patient. Based on the lack of any evidence that Dr. Linz's testimony was based on a methodology that had been tested, subjected to peer review, or was generally accepted in the scientific community, the trial court did not err when it considered such testimony unreliable under Evid.R. 702(C) and *Daubert*. *Miller*, 80 Ohio St.3d at 611–612, 687 N.E.2d 735; *Herzner*, 2008-Ohio-2261, 2008 WL 2004473, at ¶ 12.

{¶ 20} The tenants further argue that Dr. Linz's testimony was improperly excluded because he performed a differential diagnosis to arrive at his conclusion. The tenants contend that the methodology known as differential diagnosis is widely used in the medical community and therefore "satisfies the *Daubert* requirements for reliability" in Ohio. Additionally, the tenants make the unsupported statement that "[a] reliable differential diagnosis provides valid foundation for a causation opinion, even when no epidemiological studies, peer reviewed published studies, animal studies, or laboratory data are offered in support of the opinion." While we recognize that Ohio courts have considered the use of a differential diagnosis a reliable manner in which to determine causation, they have not done so in the absence of reliable medical evidence sufficient to attribute specific causation to the target cause (in this case toxic mold) and to the exclusion of all other causes (in this case other environmental or physiological conditions). See, e.g., *Valentine v. PPG Industries, Inc. ("Valentine I")*, 158 Ohio App.3d 615, 2004-Ohio-4521, 821 N.E.2d 580, at ¶ 52–56 (concluding that differential diagnosis is valid in circumstances where the causes for a condition are known or general causation existed); *Morelli v. Walker*, 8th Dist. No. 88706, 2007-Ohio-4832, 2007 WL 2729811, at ¶ 13–15 (reiterating that the Supreme Court refused to accept the use of differential diagnoses when causation had not been scientifically established). The Supreme Court has explained that the term " '[d]ifferential diagnosis' describes the process of isolating the cause of a patient's symptoms through the systematic elimination of *all* potential causes." (Emphasis added.) *Valentine II*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶ 22. Additionally,

the Supreme Court has cautioned that while "differential diagnosis is a standard scientific method for determining causation * * * its use is appropriate only when considering *potential causes that are scientifically known.*" (Emphasis added.) *Valentine II* at ¶ 22.

{¶ 21} At the *Daubert* hearing, Dr. Linz testified as to the process by which he reached a differential diagnosis of "building-related illness" for Mrs. Sparber as follows:

Okay. Prior to her phone interview I had already reviewed and considered what is the differential diagnosis for these patients in their complaints because there are some overlap between many of these folks as far as what their complaints and problems were.

So I asked [Mrs. Sparber] questions concerning time exposure, the amount of time that she was in the apartment to help delineate some degree of length of time of exposure as well as potential threshold of exposure for symptomology. I asked pointed questions concerning where visible mold or where documented mold was to correlate areas within her residence that she would be residing or spending most of her time. [I] [a]lso asked questions concerning social habits, either initially or at a later time, specifically smoking habits, those types of things. [I] [a]sked questions concerning her employment and where she spent the majority of her time and also discussed with her other things, was there – did she notice moldy odors or smells, these types of things, and were those areas able to be remediated. I discussed with her her interaction with the health department and her interaction with her landlord. I discussed with her the reasons for why she stayed in the apartment as long as she did.

I asked her subjective questions about her degree of health and symptomology that came under the heading of building-related illness. I also did ask if she sought medical attention and took any medications. And based on that information, together with all the other information that I had ahead of time, I put together a differential diagnosis and correlated that her signs and symptoms were consistent with specific building-related illness.

Dr. Linz concluded by stating that if permitted, he "would testify that [Mr. and Mrs. Sparber and their daughter] were suffering from specific building-related illness secondary to mold exposure" based on his differential diagnosis described above.

{¶ 22} When asked whether it was difficult to conduct a differential diagnosis based on the breadth of symptoms involved in "building-related illness," Dr. Linz indicated that "while it's difficult, it's not impossible." He explained his approach to determining a differential-diagnosis approach as follows:

Q: Well, in reaching a differential diagnosis, don't you have to rule out everything else as a possible cause for conditions that you're diagnosing which I assume is what, wheezing, coughing, that kind of stuff?

A: I don't think that's necessarily true. If you look at differential diagnosis, not every single diagnosis needs to be ruled out nor is it ruled out.

Q: Well, do you have to do the proper differential diagnosis to rule out most things? What do you have to do?

A: It depends on the individual person you're looking at.

It is evident to this court that Dr. Linz's differential diagnosis was not undertaken in a scientifically reliable manner and that it is contrary to Ohio law, which requires exclusion of all other causes. See, e.g., *Kerns v. Hobart Bros. Co.*, 2d Dist. No. 2007 CA 32, 2008-Ohio-2242, 2008 WL 1991909, at ¶ 94 (noting that "[u]nder Ohio law, the use of differential diagnosis requires that an expert be able to discern *all* potential causes of a particular injury before being able to isolate the single cause of a patient's symptoms" [emphasis sic]); *Terry v. Ottawa Cty. Bd. of Mental Retardation & Developmental Delay*, 165 Ohio App.3d 638, 2006-Ohio-866, 847 N.E.2d 1246, at ¶ 64 ("*Terry I*") (concluding that the trial court "correctly barred" expert testimony where the expert had failed to rule out other possible causes for the plaintiff's condition), reversed on other grounds in *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72 ("*Terry II*").

{¶ 23} The defect in Dr. Linz's methodology is made clear in an exhibit attached to the tenants' opposition motion. In that exhibit, Dr. Linz expressly stated in his differential diagnosis of Mrs. Sparber that "morbid obesity" and "[s]ymptoms associated to exposure from dust, dust mites, or foods could not be ruled out." With respect to Mr. Sparber, Dr. Linz similarly stated that "[s]ymptomatology related to exposure of dust, dust mites, and foods could not be ruled out," nor could "morbid obesity." He further noted that "[b]ronchial asthma could not be completely ruled out" for Mr. Sparber either. Thus, it is evident that the process Dr. Linz used to arrive at a differential diagnosis for the Sparbers is inconsistent with the approach recognized by the Supreme Court as being reliable, as he admits he did not rule out "all potential causes" in reaching his diagnosis of "building-related illness." *Valentine II*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶ 22. See also *Kerns*, 2008-Ohio-2242, 2008 WL 1991909, at ¶ 94; *Terry I*, 165 Ohio App.3d 638, 2006-Ohio-866, 847 N.E.2d 1246, at ¶ 64.

{¶ 24} Moreover, Dr. Linz admits that his diagnosis in the Sparbers' case is based on an analysis of the subjective complaints they relayed to him during a phone interview in November 2005—complaints that were uncorroborated by objective diagnostic testing, supporting lab results, or corresponding medical records and that had occurred four to five years prior to Dr. Linz's interview.

Dr. Linz further reflected in his differential diagnosis that the Sparbers' subjective complaints improved after moving from "the mold associated apartment" in 2001. Thus, it is apparent that contrary to the Supreme Court's directive, Dr. Linz relied on the temporal relationship between the Sparbers' subjective complaints and the presence of mold in their apartment in reaching his differential diagnosis. *Valentine II,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶ 23 (noting that contemporaneous events "do[ ] not establish the legal reliability of [an expert's] opinion" or serve as a sufficient basis for causation). See also *Kerns* at ¶ 95–98; *Valentine I,* 158 Ohio App.3d 615, 2004-Ohio-4521, 821 N.E.2d 580, at ¶ 47–48.

{¶ 25} Furthermore, Dr. Linz admitted that there is no universal recognition or scientific certainty that "building-related illness" exists as a stand-alone diagnosis. He testified on that matter as follows:

Q: And do you recall telling us with respect to the scientific community and medical community there does not exist enough evidence, scientific research to come up with [building-related illness] as a diagnosis?

A: At the time of our deposition I believe that was the feeling in the medical community.

Q: Correct. And that was November 2005?

A: That is correct, sir.

Q: And are you saying they've changed?

A: I think there is continued information in peer-reviewed literature and continued studies that are changing that, yes.

Q: They're changing it, but there's still not enough scientific research on this topic, is there?

A: Just as there's not enough research to say that it does not exist.

{¶ 26} Based on the foregoing testimony and evidence in the record, we conclude that the trial court did not err in concluding that Dr. Linz employed an inadequate methodology in reaching his diagnosis of the Sparbers, as the evidence reveals that it was based on scientifically invalid principles. *Miller,* 80 Ohio St.3d 607, 687 N.E.2d 735, at paragraph one of the syllabus. The record reveals that his differential diagnosis is unreliable and scientifically invalid pursuant to the framework set forth by the Ohio Supreme Court because he did not rule out all other possible causes for the Sparbers' symptoms. *Valentine II,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶ 22; *Terry I,* 165 Ohio App.3d 638, 2006-Ohio-866, 847 N.E.2d 1246, at ¶ 56. Furthermore, the trial court correctly considered Dr. Linz's methodology inadequate, as use of a differential diagnosis is proper only when a causal connection has been scientifically established; that is, if there is scientifically supported evidence that the

mold found in the Sparbers' apartment is capable of causing their myriad symptoms. See, e.g., *Valentine II* at ¶ 22 (noting that use of a differential diagnosis was appropriate where there was scientific evidence that breathing airborne talc caused aggravation of a preexisting sinus condition, but not appropriate where there was no scientific evidence that exposure to certain toxic chemicals caused brain cancer); *Kerns*, 2008-Ohio-2242, 2008 WL 1991909, at ¶ 94 (concluding that the use of a differential diagnosis resulted in a methodology that was "unreliable and speculative" when there remained several unknown causes for plaintiff's chromosomal abnormalities that result in congenital birth defects). No such evidence was introduced at the *Daubert* hearing. The United States Supreme Court has admonished that "nothing in * * * *Daubert* * * * requires a [trial] court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner* (1997) 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508. Such was the situation here based on the tenants' evidence. Thus, the trial court did not abuse its discretion in excluding Dr. Linz's testimony, and the tenants' arguments otherwise are without merit. Accordingly, the tenants' second assignment of error is overruled.

### Assignment of Error Number One

There are genuine issues of material fact that prohibit the entry of summary judgment by the trial court on the Sparber family's claims (May 2, 2008 order), and on the claims of all the other plaintiffs/appellants (October 27, 2008 order).

{¶ 27} In their first assignment of error, the tenants argue that the trial court erred in granting summary judgment to the owners because it applied the incorrect burden of proof to the causation elements of the tenants' claim. Specifically, the tenants point to the trial court's conclusion that they could not prove "that the toxic substance *in fact* caused the claimant's medical condition" as evidence that the trial court was requiring they prove with absolute medical certainty that the Sparbers' "building-related illness" was caused by mold. Instead, they argue that the use of a differential diagnosis, as was performed by Dr. Linz, is an appropriate methodology for determining specific causation, and further, that they need only prove specific causation by a preponderance of the evidence. Additionally, they argue that Dr. Linz's approach to his general-causation analysis has been recognized as acceptable and reliable by the Supreme Court in *Terry II*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72. We disagree.

{¶ 28} An appellate court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

It applies the same standard as the trial court, viewing the facts of the case in the light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 12, 13 OBR 8, 467 N.E.2d 1378. Under Civ.R. 56(C), summary judgment is proper if:

> (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in the favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264. Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). Id. Once this burden is satisfied, the nonmoving party bears the burden of offering specific facts to show a genuine issue for trial. Id. at 293, 662 N.E.2d 264. The nonmoving party may not rest upon the mere allegations and denials in the pleadings, but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact. *Henkle v. Henkle* (1991), 75 Ohio App.3d 732, 735, 600 N.E.2d 791.

{¶ 29} As the party moving for summary judgment, it was the owners' burden to prove that they were entitled to judgment as a matter of law. In their motions for summary judgment, the owners assert that once the motion to exclude Dr. Linz's testimony was granted, the tenants' inability to proffer any expert testimony as to general and specific causation in their case mandates summary judgment in their favor based on the Supreme Court's recent determination in *Terry II*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72.

[11] {¶ 30} In *Terry II*, the Supreme Court considered the issue of whether expert testimony is required to establish general and specific causation in mold-exposure cases. There, the Supreme Court held as follows:

> 1. To present a prima facie case involving an injury caused by exposure to mold or other toxic substance, a claimant must establish (1) that the toxin is capable of causing the medical condition or ailment (general causation) and (2) that the toxic substance in fact caused the claimant's medical condition (specific causation).
> 2. Establishing general causation and specific causation in cases involving exposure to mold or other toxic substances involves a scientific inquiry, and thus causation must be established by the testimony of a medical expert.

3. Without expert testimony to establish both general causation and specific causation, a claimant cannot establish a prima facie case of exposure to mold or other toxic substance.

*Terry II* at paragraphs one through three of the syllabus. The tenants have exclusively relied on the testimony of Dr. Linz to show causation in this case. Having previously concluded that the trial court did not err in excluding Dr. Linz's testimony because he failed to use a sufficiently reliable scientific methodology, the tenants have no evidence of causation to support their personal-injury claims. That being the case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Dresher,* 75 Ohio St.3d at 288, 662 N.E.2d 264, quoting *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265. See also *Boardman v. Stark,* 9th Dist. No. 20911, 2002-Ohio-3735, 2002 WL 1625617 (affirming the grant of summary judgment when plaintiffs conceded that they had no evidence of any injury or damages, but such elements were essential to their legal-malpractice claim). Thus, the tenants, as a matter of law, are unable to meet their prima facie burden of proving causation. Consequently, the owners are entitled to summary judgment. Accordingly, the tenants' first assignment of error is overruled.

Assignment of Error Number Three

There are genuine issue (sic) of material fact that prohibit the entry of summary judgment by the trial court on the plaintiffs/appellants' claims for emotional distress (February 6, 2006 order).

{¶ 31} In their third assignment of error, the tenants argue that the trial court erred in granting the owners summary judgment on the tenants' claims of emotional distress. They contend that the claims were supported by the tenants' affidavits and deposition testimony, evidencing both physical injuries and emotional distress experienced by the tenants who were exposed to "the toxic environment of their apartment." [1] We disagree.

{¶ 32} In that the tenants argue that summary judgment was improperly granted on their emotional-distress claims, we incorporate the standard of review from the tenants' first assignment of error. Accordingly, we review the award of summary judgment de novo. *Grafton,* 77 Ohio St.3d at 105, 671 N.E.2d 241.

{¶ 33} To prevail on a claim for intentional inflection of emotional distress, a party must prove the following:

---

1. It is clear from the record that the tenants have not established any such "toxic" environment and that the mold at issue was never tested for mycotoxins, the essence of toxicity.

(1) [t]he defendant intended to cause emotional distress, or knew or should have known his actions would result in serious emotional distress, (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency, and can be considered completely intolerable in a civilized community, (3) the defendant's actions proximately caused psychic injury to the plaintiff, and (4) the plaintiff suffered serious mental anguish of the nature no reasonable [person] could be expected to endure.

*Shetterly v. WHR Health Sys.*, 9th Dist. No. 08CA0026–M, 2009-Ohio-673, 2009 WL 370829, at ¶ 15, quoting *Jones v. White* (Oct. 15, 1997), 9th Dist. No. 18109, 1997 WL 669737, *8.

{¶ 34} The Supreme Court has defined "serious emotional distress" to "include traumatically induced neurosis, psychosis, chronic depression, or phobia." *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 78, 6 OBR 114, 451 N.E.2d 759; see also *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 374, 6 OBR 421, 453 N.E.2d 666 (overruled on other grounds) (concluding that *Paugh*'s requirement of serious emotional distress is equally applicable to claims for intentional infliction of emotional distress) and *Union Fed. Sav. Bank v. Hale* (Nov. 17, 1993), 9th Dist. Nos. 16209 and 16211, 1993 WL 488399, at *4–6 (applying *Paugh*'s definition of serious emotional distress to a claim for intentional infliction of emotional distress). "Serious emotional distress describes emotional injury which is both severe and debilitating." *Paugh*, 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, at paragraph 3a of the syllabus. This court has previously stated that in order "[t]o constitute serious emotional distress, the injury the plaintiff suffers must * * * be of such magnitude that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.'" *Jones v. White*, 9th Dist. No. 18109, 1997 WL 669737, at *9, quoting *Carney v. Knollwood Cemetery Assn.* (1986), 33 Ohio App.3d 31, 40, 514 N.E.2d 430.

{¶ 35} The Supreme Court has further elaborated on the meaning of "extreme and outrageous" conduct as follows:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager,* 6 Ohio St.3d at 374–375, 6 OBR 421, 453 N.E.2d 666, quoting Restatement of the Law 2d, Torts (1965) 73, Section 46(1), comment d. The owners argue that there is insufficient evidence to prove that the tenants suffered serious emotional harm or that the owners' conduct was extreme and outrageous. The owners point to the deposition testimony of several individual tenants, who expressly disclaimed suffering from any injury, emotional or physical, while living in the Williamsburg Court Apartments. Additionally, of those individual tenants who did allege injury from their exposure to mold, the injuries were limited to physical symptoms and generalized complaints for which the tenant did not seek medical attention.

{¶ 36} In opposition to the owners' motions for summary judgment, the tenants noted that when deposed, most tenants were not asked specifically whether they had suffered emotional distress, but instead were asked what "injuries" they had suffered while living at Williamsburg Court Apartments. Based on the absence of any specific questioning on or explanation about their emotional-distress claims, the tenants appended affidavits of 27 individual tenants to their memorandum in opposition to the owners' summary-judgment motions. In the affidavits, the individual tenants recounted, in a standardized format, that when asked in their deposition about "injuries" they had suffered based on their residing in their apartment, they did not understand that the question was meant to include any "emotional distress" they might have suffered. Had they understood that the question pertained to emotional distress, they would have responded that they had, in fact, suffered severe emotional distress because of the living conditions in their apartment, because they were forced to live in an uninhabitable environment and because they have a fear of future health problems based on the owners' misconduct. The tenants argue that this evidence demonstrates that there are genuine issues of material fact that make summary judgment inappropriate.

{¶ 37} Having reviewed the deposition testimony at issue in the light most favorable to the tenants, we consider the tenants' assertions that they misunderstood the scope of the questioning as providing the court with a sufficient explanation for the contradictory testimony. *Byrd v. Smith,* 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, at ¶ 26–29 (concluding that when the nonmoving party submits affidavits that contradict prior deposition testimony, the affiant must sufficiently explain the basis for the contradiction before a trial court can find that a genuine issue of material fact exists on the basis of the contradicted testimony). Thus, we consider the tenants' affidavits to represent their truthful response to whether they had, in their opinion, suffered emotional distress as a result of the owners' conduct. Even when viewing this evidence in the light most favorable to the tenants, however, we conclude that it does not

create a genuine issue of material fact as to whether they have an actionable claim for emotional distress.

{¶ 38} In their depositions and subsequent affidavits, the tenants merely assert that they have "suffered severe emotional distress," without any further elaboration or associated evidence supporting the same. That is, nowhere in the deposition testimony or in the affidavits are there any assertions that their "severe emotional distress" consisted of the serious psychological effects that the Supreme Court has recognized as constituting an actionable claim for serious emotional distress. *Paugh,* 6 Ohio St.3d at 78, 6 OBR 114, 451 N.E.2d 759 (remarking that serious emotional distress is marked by emotional injury that is "severe and debilitating" and "include[s] neurosis, psychosis, chronic depression, or phobia") and *Yeager,* 6 Ohio St.3d at 374, 6 OBR 421, 453 N.E.2d 666 (applying *Paugh* to claims for intentional infliction of emotional distress). To the extent that any tenants complained in their deposition testimony that they had suffered from emotional distress, the complaints were confined to two witnesses, one of whom stated that she was "concerned" and another who was "upset[ ] to think [of what might] happen to you from being exposed to [mold]." Moreover, the affidavits proffered only a generalized, nonspecific statement that the tenants suffered emotional distress based on situations of financial despair due to living in an "uninhabitable environment" and their fear of future health problems related to their mold exposure. Such despair and fears do not serve as an adequate evidentiary basis upon which a party can survive summary judgment on an emotional-distress claim. See, e.g., *Slane v. MetaMateria Partners, L.L.C.,* 176 Ohio App.3d 459, 2008-Ohio-2426, 892 N.E.2d 498, at ¶ 27–32 (concluding that summary judgment for defendant was appropriate on plaintiff's claim for intentional infliction of emotional distress based on his fear of developing lung cancer, despite evidence that plaintiff had workplace exposure to carcinogenic chemicals, had already developed sinus cancer, and had received psychotherapy to deal with his anxiety over future developments of cancer); *State v. Pappas* (Apr. 11, 2001), 9th Dist. No. 20226, 2001 WL 358390, at *6 (concluding that summary judgment for defendant was appropriate on plaintiff's claim of intentional infliction of emotional distress when plaintiff had evidence that he suffered financial loss as a result of being terminated and then later reinstated because he lacked evidence that such loss caused him extreme mental anguish). There was no evidence that any tenants ever sought treatment for any of their emotional distress, and none of them reported having been diagnosed with any mental or psychological condition at any point during or after their tenancy at Williamsburg Court Apartments.

{¶ 39} Because the tenants were unable to present any evidence that they had suffered severe emotional distress, they have a "complete failure of proof

concerning an essential element of [their] case [that] renders all other facts immaterial." *Dresher*, 75 Ohio St.3d at 288, 662 N.E.2d 264, quoting *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265. Accordingly, the trial court did not err in granting summary judgment in the owners' favor on the tenants' claims of intentional infliction of emotional distress.

{¶ 40} Next we consider the tenants' claims for negligent infliction of emotional distress. "Ohio courts have limited recovery for claims alleging negligent infliction of emotional distress to situations such as where the plaintiff was a bystander to an accident or was in fear of physical consequences to his own person." *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 40, 665 N.E.2d 1115; *Heiner v. Moretuzzo* (1995), 73 Ohio St.3d 80, 82–86, 652 N.E.2d 664; and *Roberts v. Hagen* (Feb. 9, 2000), 9th Dist. No. 2845–M, 2000 WL 150766, at *3. "Ohio does not recognize a claim for negligent infliction of serious emotional distress where the distress is caused by the plaintiff's fear of a nonexistent physical peril." *Heiner* at syllabus.

{¶ 41} The owners again argue that there is insufficient evidence that the tenants suffered any emotional injury based on the absence of any claims of such injuries in the deposition testimony recounted above. In turn, the tenants rely on the Supreme Court's holding in *Binns v. Fredendall* (1987), 32 Ohio St.3d 244, 513 N.E.2d 278, at paragraph one of the syllabus, for the proposition that "[n]egligently inflicted emotional and psychiatric injury sustained by a plaintiff who also suffers contemporaneous physical injury in a motor vehicle accident need not be severe and debilitating to be compensable." Thus, the tenants argue that they need not demonstrate severe and debilitating emotional injury, because they suffered physical injuries as manifested by their chronic health problems while residing in their Williamsburg Court Apartments. The tenants also rely on *Schultz v. Barberton Glass Co.* (1983), 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109, syllabus, to argue in the alternative that a claim for negligent infliction of emotional distress can also be maintained "without a contemporaneous physical injury" when the plaintiff has suffered serious emotional distress as a result. Tenants similarly point to *Lavelle v. Owens–Corning Fiberglas Corp.* (1987), 30 Ohio Misc.2d 11, 30 OBR 223, 507 N.E.2d 476, for the proposition that a plaintiff has a valid claim for negligent infliction of emotional distress when a plaintiff has "a reasonable apprehension [of future illness that] manifests itself in mental distress."

{¶ 42} The tenants' arguments, however, ignore the central holdings of *Heiner* and *Binns*, which preclude recovery for negligent infliction of emotional distress when there is no evidence of any actual physical peril or when the plaintiff is not a bystander to an accident. *Heiner*, 73 Ohio St.3d at 85–87, 652 N.E.2d 664; *Binns* at 246–247, 513 N.E.2d 278. These limitations were expressly set forth in

*Heiner*, where the Supreme Court recounted the development of the law governing negligent infliction of emotional distress claims. The *Heiner* court opined as follows:

> [I]n *Schultz* [*v. Barberton Glass Co.* (1983), 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109], we expanded the law to allow recovery for negligent infliction of emotional distress without proof of a contemporaneous physical injury *for plaintiffs who are directly involved in an accident.* In *Paugh*, we extended the rule of *Schultz* to permit recovery *for purely emotional injuries for plaintiff-bystanders who were not directly involved in the accident.* However, in *Paugh*, we set forth certain limitations on the right to recover for emotional injuries by requiring, among other things, that the emotional injuries suffered by the plaintiff must be severe and debilitating and reasonably foreseeable. *Binns* reminds us that *a plaintiff who suffers physical injuries in an automobile accident may recover for the emotional distress associated with his or her own injuries, as well as the distress associated with having observed the death or injury of another occupant of the vehicle,* whether or not the plaintiff's emotional injuries are severe and debilitating.

(Emphasis added and citations omitted.) *Heiner* at 85, 652 N.E.2d 664. The *Heiner* court specifically distinguished permissible causes of action by noting that in *Schultz*, "the person seeking recovery for negligent infliction of serious emotional distress had been involved in an *actual physical calamity*" and that in *Paugh*, the "the person seeking recovery for emotional distress had been aware of a *real and existing physical peril*." (Emphasis added.) Id. Similarly, in *Binns*, the court expressly reserved recovery to "plaintiffs directly involved and contemporaneously injured in the same * * * accident." *Binns*, 32 Ohio St.3d at 246, 513 N.E.2d 278. As a result of such limitations, the *Heiner* court concluded that the complaining plaintiff, who was given a false positive result following her HIV test, was barred from recovering for negligent infliction of emotional distress because her fear was based on a nonexistent peril.

{¶ 43} In the case at bar, the tenants were not involved in an actual physical calamity, nor were they bystanders to any accident. *Schultz*, 4 Ohio St.3d at 136, 4 OBR 376, 447 N.E.2d 109; *Binns* at 246, 513 N.E.2d 278. Moreover, as we have previously concluded, they have failed to proffer any evidence that the mold in their apartment created a real or existing physical peril. *Heiner*, 73 Ohio St.3d at 87, 652 N.E.2d 664. Consequently, the tenants do not have an actionable claim under any recognized theory of recovery for negligent infliction of emotional distress. Accordingly, the trial court did not err in granting the owners' motions for summary judgment on the tenants' claims of negligent infliction of emotional distress.

{¶ 44} While we recognize that the tenants were concerned about residing with their family and children in an environment tainted by the presence of mold, we note that "the facts of this case remind us that not every wrong is deserving of a legal remedy." *Heiner* at 88, 652 N.E.2d 664. For the foregoing reasons, the tenants' third assignment of error is overruled.

## Sam's and First Realty's Cross–Assignment of Error

The trial court erred as a matter of law by denying the motion to bifurcate compensatory damages and punitive damages trials as required by R.C. 2315.21(b)(1), as enacted by S.B. 80.

{¶ 45} In their cross-assignment of error, Sam's and First Realty argue that the trial court committed reversible error by failing to grant their motion to bifurcate the punitive-damages issue from the compensatory-damages issue. Having affirmed the trial court's grant of summary judgment in this matter, Sam's and First Realty's alleged error is moot. App.R. 12(A)(1)(c).

## III

{¶ 46} The tenants' three assignments of error are overruled, and Sam's and First Realty's cross-assignment of error is moot. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

CARR, P.J., and BELFANCE, J., concur in judgment only.

CARR, Presiding Judge, concurring in judgment only.

{¶ 47} Although I concur in the result reached by the majority, I would analyze the first assignment of error exactly as the trial court did to conclude that the tenants did not present evidence of specific causation in their response to the owners' motions for summary judgment. I agree with the trial court's analysis that the tenants' argument that "Dr. Linz ruled in certain potential causes and ruled out certain potential causes" is insufficient under *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72.

{¶ 48} I further agree with the trial court's conclusion that the methodology that Dr. Linz did or did not use is irrelevant, since the "[p]laintiffs have not set forth any medical testimony to support specific causation." I would hold, therefore, that the tenants' second assignment of error is moot.

{¶ 49} As to the tenants' third assignment of error, I would hold that the tenants did not establish either intentional and/or negligent infliction of emotion distress. I agree with the trial court's conclusion that "inconvenience, anxiety,

financial despair, and fear do not rise to the level of the emotional distress needed to recover."

{¶ 50} I agree with the majority's conclusion that Sam's and First Realty's cross-assignment of error is moot.

{¶ 51} For the reasons set forth above, I concur in judgment only. I would affirm, but on different grounds.

BELFANCE, Judge, concurring in judgment only.

{¶ 52} I concur in the result. In *Daubert,* the United States Supreme Court made clear that it is the duty of the trial court to ensure that scientific evidence is not only relevant but reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469. Prior to *Daubert, Frye v. United States* (C.A.D.C.1923), 293 F. 1013, was the controlling standard for admissibility of an expert opinion based on a scientific technique. *Daubert* at 584–585, 113 S.Ct. 2786, 125 L.Ed.2d 469. Under *Frye,* scientific expert testimony was not admissible unless the technique was "generally accepted" as reliable in the scientific community. Id. at 584, 113 S.Ct. 2786, 125 L.Ed.2d 469, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (C.A.9, 1991), 951 F.2d 1128, 1129, quoting *United States v. Solomon* (C.A.9, 1985), 753 F.2d 1522, 1526. In *Daubert,* the court rejected the more "austere" and limiting *Frye* standard as incompatible with the Federal Rules of Evidence. *Daubert* at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469. ("[A] rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.' ") Id. at 588, 113 S.Ct. 2786, 125 L.Ed.2d 469, quoting *Beech Aircraft Corp. v. Rainey* (1988), 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445. Notwithstanding the liberal standard of relevance reflected in the rules, the *Daubert* court recognized that Fed.R.Evid. 702 "contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Daubert* at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469. Expert testimony must pertain to "scientific knowledge[,]" and hence possess evidentiary reliability. Id. at 590, 113 S.Ct. 2786, 125 L.Ed.2d 469. Furthermore, it must be relevant. Id. at 591, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶ 53} The principles enunciated in *Daubert* have been adopted by the Supreme Court of Ohio in *Terry v. Caputo,* 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, in which the court stated:

> The test for reliability requires an assessment of the validity of the expert's methodology, by applying with flexibility several factors set forth in *Daubert.* The trial court should first assess whether the method or theory relied upon has been tested. Next, it should consider whether the theory has been the subject of peer review, and then whether the method has a known or potential

error rate. Finally, *Daubert* instructs trial courts to look at whether the theory has gained general acceptance in the scientific community. None of these factors, of course, is dispositive of the inquiry, and when gauging the reliability of a given expert's testimony, trial courts should focus "*solely on principles and methodology,* not on the conclusions generated." (Emphasis added and citations omitted.) *Terry* at ¶ 25, quoting *Daubert* at 595, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶ 54} In determining whether Dr. Linz's scientific knowledge would assist the trier of fact to understand the evidence or to determine a fact in issue in the case, the trial court was charged with assessing the scientific validity of the methodology employed by Dr. Linz upon which his ultimate opinion was based. In examining the testimony offered by Dr. Linz at the *Daubert* hearing, as well as his affidavit, it is evident that the trial court could not discern whether Dr. Linz's methodology was scientifically valid, given that there was no substantive explanation of the scientific methodology employed in conducting the differential diagnosis. Dr. Linz did describe the questions he asked of the plaintiffs and some of the other data that he examined; however, he did not explain why the information he evaluated formed the basis of a scientifically valid methodology. Thus, in light of the lack of detail offered by Dr. Linz, it was not possible for the trial court to assess whether his differential diagnosis was conducted pursuant to a scientifically valid methodology. Dr. Linz also stated that he did not engage in the same process of evaluation that he had previously employed with other patients in diagnosing building-related illness. He also acknowledged that his prior evaluations entailed more specific testing than conducted in this case. Notwithstanding this admission, the trial court was not given any explanation as to why the process he employed in this case was also scientifically sound. Thus, while I acknowledge that the standard with respect to relevance "is a liberal one[,]" *Daubert,* 509 U.S. at 587, 113 S.Ct. 2786, 125 L.Ed.2d 469, I agree that the trial court did not commit reversible error in excluding the testimony of Dr. Linz.

{¶ 55} With respect to the claims of intentional and negligent infliction of emotional distress, I concur that although the tenants *alleged* that they suffered severe emotional distress, they did not properly meet their burden on summary judgment to provide specific evidence that they had in fact suffered severe emotional distress. Thus, it was appropriate to grant summary judgment as to these claims. However, I disagree with paragraphs 42 and 43 of the majority opinion, wherein it is implied that the Supreme Court of Ohio has limited claims of negligent infliction of emotional distress to situations involving an actual physical calamity to the plaintiff or to bystanders to an accident. In my view, the parameters of such a claim are not so limited. See *High v. Howard* (1992), 64 Ohio St.3d 82, 85–86, 592 N.E.2d 818, overruled on other grounds by *Gallimore v.*

*Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 617 N.E.2d 1052 ("Ohio courts have limited recovery for negligent infliction of emotional distress to such instances as where one was a bystander to an accident or was in fear of physical consequences to his own person").